McGee v. The Securities and Exchange Commission. Thank you. Good morning. Good morning, Your Honor. May it please the Court. Good morning, Your Honors, opposing counsel. My name is Megan Thomas, and I represent Bernard McGee, the appellant in this matter. Your Honors, we are asking that you reverse the decision issued by FINRA and affirmed by the NAC and SEC for three reasons. First, there is not substantial evidence to support the findings. The SEC has ignored the testimony and NAC statements that support their points and ignoring evidence that clearly exonerates Mr. McGee. Secondly, the FINRA and SEC rules used to sanction Mr. McGee are not applicable because the CGA was not a security and Mr. McGee did not act with signature.  and imposed an inappropriate burden on competition. Your Honors, according to the APA and Supreme Court precedent, this Court not only may, but is required to overturn agency decisions that are not supported by substantial evidence. Here's my question. You make a lot of the fact that you might not have been aware of what Griffin was up to and what was going on. I don't see any relevance to the Griffin case in this case. This case is about this particular transaction and the failure to disclose the $50,000. That's what it's about, isn't it? Your Honor, this case is, it is alleged that . . . And apart from the other indiscretions that are pointed out by the other side. Your Honor, it is alleged that our client was involved in high level fraud, was aware of this issue. Let's leave that out. What about the $50,000? Just take that transaction, the failure to disclose to your client that you're getting $50,000 in respect, with regard to a transaction that is 10% and the failure to disclose it. So, why isn't that substantial evidence? Your Honor, first of all, Mr. McGee was unaware of the fact that he would be obtaining a commission until eight days after he, after the sale of the 54F product went through. Secondly, under New York State law, there is no requirement to disclose a commission. Why is New York State law control here? I mean, this is a, these are federal regulations, aren't they? Yes, Your Honor. However, the product involved was a fixed indexed annuity. And according to the SEC, fixed annuities are not securities, which means . . . Now you're slipping into the third, the second point you're making. But there's case law to say that if it's part of a transaction that involves the sale of securities, and there was a sale of securities in order to purchase these financial instruments, that that would do it, as far as purchase and sale are concerned of securities. Your Honor, I believe you are referring to the SEC v. Zandford, and I would respectfully disagree that that case is analogous to this case. In that case, the . . . Not one transaction. She's taking her existing securities and putting them into new securities. Actually, she didn't even know that. She thought she was just giving them to him in his new company name to handle. I mean, I'm not at all aware of the level of her knowledge here. It seems as though she was really relying very heavily on your client for everything. Your Honor, first of all, to go back to Zandford to point out how it is different from this case, in that case, the court specifically said, this is not a case in which after a lawful transaction, a broker decided to steal the proceeds. And that is why they decided that that case involved a security and therefore was regulated by FINRA. In our case, there was a lawful transaction. But for Griffin's fraud, this whole issue never would have been a problem. You mean the investigators wouldn't have looked into it? No, Your Honor, that is not what I mean. I mean, it was not problematic for him to accept that commission based on New York State law and even based on federal law. Again, under the SEC . . . Your argument is this is not within the ambit of FINRA and doesn't have anything to do with the securities laws. But Zandford did say that when you have a multi-step transaction, if there's a security on either side of that transaction or somewhere in the course of it, it's a security. It's a securities transaction. And here, the charitable gift annuity may or may not be a security, but the variable annuity that the client cashed in certainly was. And it was cashed in . . . You agree with that, don't you? That was a security. Your Honor, I do agree that that was a security, yes. However, I disagree . . . Why isn't this not a securities transaction? This is not a securities transaction because although the product that was sold was a security, the issue here is the product that was bought. McGee received . . . That may be the issue in terms of what the fee was based on, but it's a question of whether there's a material omission or fraud in connection with the purchase and sale of securities. And so, then we have to look at, well, is the connection restricted to the security that is actually in question, or can it also be the security that was sold in order to purchase the security in question, when it's all part of one transaction? Yes, Your Honor. It seems to me that the case law indicates a broader interpretation in connection with . . . in this regard. Your Honor, I do agree with you that in some case that there is overall a broad interpretation. However, this would be an overly broad interpretation, and here is why. Again, in Zanford v. the SEC, the court said, this is not a case in which after a lawful transaction, a broker decided to steal proceeds. The broker in that case had intent from the beginning. Our client, Mr. McGee, was misled by the fraud, just like everyone else. He was also . . . Well, he wasn't misled about his fee, which was going to be 10 percent for doing this. Your Honor, at the time of the sale, he was. He did not know that he was going to be receiving a commission until eight days after the sale he received that commission. Isn't there evidence on both sides of that? Your Honor, there is not conclusive evidence that he knew about the commission before. There's not conclusive evidence, but there's sufficient evidence for FINRA to have actually waited in the other direction. Your Honor, I would again argue there is not substantive evidence, and that is what the burden was from the SEC to prove by substantive evidence that he was aware of this transaction or that he was aware that he would receive the commission. What did he do once he was aware of it to disclose immediately? Once he was aware of the transaction, Your Honor, he did not That's an in-house investigation that's going on, presumably designed to help to put everything in the best light for the company, and so I'm not sure we should rely too heavily on that. Your Honor, I see that my time has expired. May I briefly conclude? Go ahead. Your Honor, first of all, I don't think that she had any alliance to Mr. Magee at that point. They were more concerned about Cateret's position and about their image, so she had no incentive to cover up for him. Your Honor, for the foregoing reasons, we respectfully request that you reverse FINRA's decision, which was affirmed by the NAC and SEC, to restore Mr. Magee's livelihood and reputation in his community that he worked for 30 years to establish. Thank you. You've reserved two minutes for a bubble. Yes. We'll hear you then. Thank you. May it please the Court, Benjamin Nutter of the Securities and Exchange Commission. I hope to be brief, Your Honor. I just wanted to make two points regarding evidence. The first is that, according to the stipulations entered in the record, and you can find this at page 898, Mr. Magee stipulated, and I quote here, before CF's purchase of the 54 CGA, the charitable gift annuity, Magee was aware that 54 paid commissions to third-party financial professionals, such as Magee, for the sales of CGAs. And that right there is substantial evidence that he knew before the purchase of this annuity that he would be receiving a commission. As to the question of the amount of the commission... Well, that's where I was going to get to, the amount. If he didn't know the amount at that point, what was there to disclose? Well, he did know the amount before she actually effected the purchase, because if you look at his own testimony, he testifies that between the time that he filled out all of the redemption forms for the variable annuities and sent them off to the Hartford and the Pacific Life on her behalf, he contacted Mr. Griffin, and Mr. Griffin told him he would be getting 10%. Before he went back to collect the checks and take the money over to 54 Freedom, he made a chart, and this actually, I believe, also is in the record. There's a spreadsheet where it shows the commission he gets, and it's 10% of the gross proceeds of the liquidation. So he's not even being paid a 10% commission on the amount that she purchases the charitable gift annuity in. He's being paid the commission on the securities transaction itself. You're saying he got the commission on the securities transaction, but he got the commission on that leg of it that did not necessarily involve securities. Let me give you a hypothetical. He counsels her to sell half a million dollars worth of securities and to buy a house on which he gets a 6% brokerage commission. Why is that not very similar, and how could that be a commission on a securities transaction? Your Honor, I think, I mean, if you're talking in your hypothetical, as I understand it, the 6% commission is being paid on the sale of the house itself. On the sale of the house, that's correct. So the 6% is measured by the — On the purchase of the charitable gift annuity, which may not be a security. Well, I agree with you in that respect, Your Honor, that formally he was paid the commission by 54 Freedom because she sold 10% of the gross proceeds of the securities transaction, which just suggests that these are not unrelated events. So in your hypothetical of the sale of the house, Your Honor, and I think Zanford backs this up. If you read Zanford carefully, Zanford is talking about a situation where someone is counseled or recommended that they enter a securities transaction with a mind for what the proceeds will be used for. And what Zanford stands for — that would be a problem. And if the commission — if I'm a broker and I'm recommending to my customer, no, it's a really good investment opportunity for you to liquidate your government bonds, take the proceeds, and buy this house, if I don't disclose to them as a broker that I am going to make a commission on the sale of that house, I have violated FINRA's rules very likely. And again, I'm speaking hypothetically, Your Honor. I'd like to be clear about that. That seems very strange. I mean, you probably would be violating the law of the Realty Association or the rules of the Realty Association. And maybe you might be violating state law if you don't disclose you're going to get a brokerage fee on the sale of real estate. But it's hard to see where that would be a commission on a securities transaction. Well, again, Your Honor, the question is what is the transaction? How are you defining the transaction and the recommendation here? The recommendation here was a liquidate-to-purchase strategy. Liquidate your variable annuities to purchase a charitable gift annuity. So you have to, as a broker dealing with your customer, disclose all material information to the recommendation. Now, the fact — and again, Zanford speaks to this — the fact that the securities transaction itself does not involve any misconduct or fraudulent behavior. Just the sale of the securities itself — My understanding is not disclosing a commission on a securities transaction itself is a violation. It doesn't matter whether what is bought is legitimate. Well, that is also — in this case, suppose he had gotten — I don't know, I'm just going to pick a random number here — suppose he had gotten a 15 percent commission on the liquidation of the variable annuities. Well, that is actually not an industry standard commission. It's an excessively high commission. That would have to be disclosed to her. On the flip side, because he's a broker and he has a brokerage relationship with his customer, if he had gotten a standard in-house commission from his employer on the liquidation of the variable annuities, that perhaps doesn't need special and specific disclosure. It would be disclosed in the closing documents on the sale itself. But again, if it's an excessive commission, it probably has to be disclosed independently and specifically to the customer. What would the standard commission be under these circumstances? I'm afraid I can't answer that question. I don't know what the commission on the sale of a variable annuity would be. I just don't know, Your Honor. Does the court have to decide whether or not the CGAs are in fact securities in order to affirm the decision? No, that's unnecessary under Zanford. Again, the question here is the connection between the liquidation of the security here, and it's undisputed that the variable annuities are securities, and the purchase of the charitable gift annuity. And here the evidence supports that this was a recommendation to liquidate your variable annuities and purchase a charitable gift annuity. And because he made the recommendation, he was under an obligation to disclose all material information to the recommendation. I believe the term in Zanford is independent events. Yes. Or not independent events. Zanford does speak in that terms. It also talks about how this coincides. And that speaks towards the independence of the two events. And here they are not independent at all. You referred to the commission on the sale of the variable annuity, but it's actually a commission on the purchase of the charitable gift annuity, which may not be a security. You're absolutely correct, Judge Jacobson. The commission on the fixed annuity, charitable annuity, measured by the sale of the variable annuity. Is that correct? That is correct. The amount of the commission was not 10 percent of the 400 and I believe about 54,000 that she purchased for the charitable gift annuity. The amount of the commission was $49,000, which was 10 percent of the roughly 490-some-odd thousand dollars that was the gross proceeds from the liquidation of the variable annuities. Now the reason for the difference in the... That was because only a portion of that money was used to buy the fixed annuities, correct? Well, that's correct. And the portion that was used was the net proceeds. She had to pay surrender charges and taxes on the variable annuities. So the difference between the 490-some-thousand and the 450-some-thousand is represented by surrender charges paid to the annuity companies and taxes. But this didn't have anything to do with the actual annuities that were purchased by 54 after this transaction, because I believe that was a lesser amount, right? That was an even lesser amount. No, that was like 250 or something. Something along those lines. And Lincoln Financial refunded those as soon as they were aware of the fact that Ms. McGee, I'm sorry, Ms. McGee, Ms. Fox was a New York resident. So the amount of the restitution is the difference? Yes, yes. Yes, that's correct, Your Honor. What's your view as to whether or not the CJA is a security? I really couldn't opine on that at this point, Your Honor. The Commission expressly said in the order that it was unnecessary to decide in this case. So I would prefer not to speculate. If the Court has no further questions, the Commission asks that you deny the petition. We'll hear rebuttal. Your Honors, first of all, the sale here was different from the sale in Zanford because the sale was not coerced. Additionally, in Zanford, the broker had intent from the very beginning, and the Court specifically stated that the product... You have a case that supports you. You're distinguishing a case that kind of cuts against you. But do you have a case that supports you that's similar to this case and its facts that supports your position? Yes, Your Honor. In McCarthy v. the SCC... Tell us about that one. Yes, this is a Second Circuit case in which a broker who was a broker for nine years, he was an upstanding citizen, was a minimal participant in fraud. And in that case, the Court found that a two-year suspension of his license was excessive. Oh, no, you're talking about a different issue. I'm talking about whether this is a security or not, whether this is in connection with a purchase or sale of a security. In other words, a case that says that where you sell a security that is a security to buy something else, a house or a fixed income charitable annuity or something else, is not... There's no... It's not in connection with a purchase or sale of security if the commission is based on the latter. Your Honor, there was not a case with exactly or very similar analogous facts. However, the SCC does state on their website where they explain what variable and fixed annuity is, that a fixed annuity is a CGA. And again, when the purchase of the CGA is what is at issue, because that is what was connected with the commission here. Getting back to my second point, which is that the sanctions were excessive, oppressive, and imposed an inappropriate burden, the SCC does show that these burdens were excessive and oppressive. He already hasn't had his license for several years, and he has basically served his penalty. I see that my time is up. May I briefly conclude? Go ahead. Again, for the following reasons, we respectfully ask that you reverse the decision. Thank you. Thank you both. We'll reserve decision.